# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:17-cv-485-FDW

| | | |
|---|---|---|
| **DANNY R. HEMBREE, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **FNU BRANCH, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THIS MATTER** comes before the Court on Defendants' Motions for Summary Judgment, (Doc. Nos. 88, 97). Also pending is a Motion for Extension of Time, (Doc. No. 101), filed by the *pro se* Plaintiff.

## I.     BACKGROUND

*Pro se* incarcerated Plaintiff's Amended Complaint, (Doc. No. 62), passed initial review against Defendants Branch and Whitlock for the use of excessive force; against Defendants Allie and Flitt for deliberate indifference to a serious medical need; against Defendants Branch, Carter, Hughes, Kim, Long, and Whitlock for unwanted medical care; and against Defendant Cloninger on supervisory claims. The Court also exercised supplemental jurisdiction over Plaintiff's claims of North Carolina assault, battery, and negligence.

**(1)     Amended Complaint** (Doc. No. 62)

In the Amended Complaint which Plaintiff declares to be true to "the best of [his] belief and knowledge," (Doc. No. 62 at 16), Plaintiff alleges that he was transported from Central Prison to the Gaston County Jail on March 9, 2016. Plaintiff was questioned by the intake deputy, Sergeant Price, upon arriving at the Jail with regards to his health status and medical needs

1

including medications. Plaintiff told Price that he has stage-4 liver disease, diabetes, neuropathy, and a heart ailment. He complained of shortness of breath, body aches, and pains. Price told Plaintiff that he would be seen by medical within a few days as a routine matter. NCDPS officers turned over Plaintiff's medications including Neurontin, which had been prescribed by Dr. Vincent Wilson at Central Prison, as well as the medical protocol instructing the Jail how and when to administer Plaintiff's medications. Plaintiff was issued Jail clothes and a bedroll and was assigned a cell by a classification officer.

Between one and three hours later, Plaintiff was escorted to medical for a routine intake screening by Nurse Allie. Nurse Allie told Plaintiff that Dr. Flitt had denied administration of Plaintiff's Neurontin used to treat Plaintiff's extremely painful neuropathy because it is one of the non-narcotic drugs that Flitt had banned from use in the Jail. Plaintiff asked for ibuprofen or Tylenol for his body aches, pains, and low-grade fever. Allie told him that she would call Dr. Flitt to ask about Plaintiff's request but that they usually did not treat low-grade fever. Plaintiff was then escorted back to his cell.

Approximately 16 hours later, Plaintiff was advised over the intercom system by a female deputy that he needed to see the nurse in medical to have his sugar checked. Plaintiff told the deputy that he was he was refusing all medical treatment until Dr. Flitt approved the Neurontin. The deputy said that Plaintiff could not refuse medical treatment because he was in jail. Plaintiff reiterated that he would continue to refuse all medical treatment at the Jail until Dr. Flitt agreed to administer the prescribed Neurontin.

Five or 10 minutes later, Deputies Branch and Whitlock entered Plaintiff's cell while Plaintiff was lying passively on the bottom bunk. Branch and Whitlock told Plaintiff to get up because he was going to medical to see the nurse. Plaintiff stated that he did not need to see the

nurse because he was refusing medical treatment until Dr. Flitt agreed to provide his prescribed medication. Branch and Whitlock grabbed Plaintiff by his arms, "violently snatched" him off of his bunk to a standing position, and deliberately forced him into the wall headfirst, causing a 3 ½ inch laceration to his eyebrow which bled profusely. (Doc. No. 62 at 6). This entire interaction took less than 30 seconds. Emergency medical care was needed to stop the bleeding. Plaintiff also suffered a large contusion on the right side of his face, eye, and injury to his neck and shoulder that had to be treated upon Plaintiff's return to Central Prison several days later. At no time did Plaintiff attempt to assault or batter Branch and Whitlock in any way or attempt harm any Jail employee. Plaintiff was handcuffed behind his back as his face bled profusely, was roughly handled, and forced by Branch and Whitlock to go to the medical department against his will where he was "further assaulted" by Nurse Kim Carter. (Doc. No. 62 at 8).

Sergeant Hughes (holding a digital camera), Deputy Jennifer A. Long, and Nurse Kim Carter were at the medical department when Plaintiff arrived there. Nurse Carter directed Deputies Branch and Whitlock to put Plaintiff in a chair where they forcefully restrained him. Nurse Carter cleaned and treated Plaintiff's facial laceration. Plaintiff was covered in blood was in a lot of pain which caused him to be emotional and loudly express his feelings by using profanity. Plaintiff told Nurse Carter that he was refusing all medical care, however, she said that he could not refuse and that she had an obligation under the health codes to clean up the blood and stop the bleeding to prevent danger from blood-borne pathogens. Plaintiff said "fine, go ahead" but to stop bothering him after the wound was cleaned and stopped bleeding. (Doc. No. 62 at 9). Nurse Carter said she intended to check Plaintiff's vital signs and take a blood sample from his finger to check his sugar, but Plaintiff stated "no, you['re] not, I do not consent to any further treatment, once your through cleaning my eyebrow." (Doc. No. 62 at 9). Nurse Carter put a blood pressure cuff on Plaintiff's

arm against his will while he was handcuffed and restrained by Branch and Whitlock. Nurse Carter attempted to take Plaintiff's temperature but Plaintiff refused to open his mouth. At this point, Plaintiff had informed Nurse Carter several times that he was making a competent, informed decision to refuse all medical treatment at the Jail due to their refusal to provide his prescribed medication. Nurse Carter threatened to have Branch and Whitlock strip him and restrain him while she took his temperature rectally if he would not cooperate. Plaintiff opened his mouth for Nurse Carter to take his temperature orally under duress. At this point, Nurse Carter went behind Plaintiff's back and pricked his finger for a blood test against Plaintiff's will. Plaintiff was forcefully escorted back to his cell by Branch and Whitlock, under the direct supervision of Sergeant Hughes.

Plaintiff remained at the Jail for approximately seven to 10 days after the assault, battery, and denial of medication. He continued to refuse medical care during that time but was not assaulted further. Dr. Flitt continued to refuse to follow Plaintiff's prescribed medical protocol and refused to dispense his medication, which resulted in extreme, intense, and unnecessary pain.

Plaintiff returned to Central Prison on March 17, 2016. At that time, he was screened by medical staff whom he advised that he had been assaulted, battered, and denied prescribed medication by the Gaston County Sheriff. Plaintiff was treated by his long-term primary care physician, Dr. Wilson, within 72 hours after he was referred to Central Prison's urgent care unit. Dr. Wilson treated Plaintiff's neck, back, and facial injuries with ibuprofen and instructed him on how to help speed his recover and prevent further damage. Plaintiff was also started back on all of his medications including Neurontin for his extremely painful neuropathy. Plaintiff was later treated by mental health professionals for a sleep disorder, depression, anxiety, and PTSD that was exacerbated by the attack by Branch and Whitlock. Plaintiff is still suffering PTSD symptoms from

their actions.

Plaintiff seeks declaratory judgment, injunctive relief, compensatory and punitive damages, a jury trial, any and all other relief that the Court deems proper.

### (2) Defendants Branch, Cloninger, Hughes, Long, and Whitlock

#### (A) Motion for Summary Judgment (Doc. No. 88)

Defendants argue that the evidence, including body camera footage, shows that no Eighth Amendment violation occurred and Defendants only used the force that was reasonably necessary to obtain compliance with lawful orders. The administered medical treatment was necessary and Plaintiff was allowed to refuse further treatment after medical personnel assessed his condition. The Sheriff did not fail to protect Plaintiff and the policies and training were adequate. Defendants are entitled to qualified immunity, public officers immunity, and governmental immunity.

#### (B) Plaintiff's Response (Doc. No. 102)[1]

Plaintiff argues that he was "manhandled" when he refused to go to medical and that his head was bounced off a cell wall, resulting in an injury that required medical attention that day and still causes short-term memory loss, PTSD, a sleep disorder, and headaches. (Doc. No. 102 at 2). Plaintiff claims that he is frail and mentally ill and admits he vocally resisted but "steadfastly denies any physical resistance." (Doc. No. 102 at 3). Plaintiff did not think he was given a lawful order to go to medical as he was refusing all care. The bodycam shows that Plaintiff was not physically resisting and that 29 seconds elapsed between Branch and Whitlock's entry into the cell and departing after assaulting and handcuffing Plaintiff. Defendants should have taken a few seconds to explain to Plaintiff that he could refuse medical care in medical, which would have rendered the use of force unnecessary. There are numerous disputes of material fact, which is made

---

[1] The Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff of the importance of responding to Defendant's Motion and the applicable legal standard. (Doc. No. 93).

clear by the bodycam footage and conflicting statements by Plaintiff and Defendants. Plaintiff was never combative and the use of force by Branch and Whitlock was unnecessary and malicious. There was no need for force because this was not an emergency situation and Plaintiff was lying passively on his bunk. Plaintiff was not given the chance to comply and the officers' actions escalated the situation. Qualified immunity does not apply because Plaintiff had the clearly established right to be free from the use of excessive force. Sheriff Cloninger and Sergeant Hughes were responsible for the training, supervision, and actions of their subordinates when Plaintiff was assaulted in his cell. Plaintiff filed a grievance with the Jail and there was never follow-up. Where federal claims are upheld, state claims are likewise upheld. There was no justification for Defendant's actions and the use of force was malicious and without provocation. Public officer immunity is not appropriate because Branch and Whitlock acted with malice outside the scope of their duties. Governmental immunity does not apply because the Defendants are individually liable for their actions.

**(C)** **Defendants' Reply** (Doc. No. 103)

Plaintiff simply disagrees with Defendants' evidence and dislikes the video footage. He makes assumptions about Defendants Branch and Whitlock's motives or awareness in the face of videos and affidavit testimony from Defendants as to their rationale and motives, none of which support Plaintiff's claims. Plaintiff's affidavit simply indicates he does not agree with Defendants' affidavits or evidence. But he presents no evidence to refute Defendants' evidence. Plaintiff claims there is other video footage reflecting Branch and Whitlock's state of mind at the time of the cell incident, albeit after the cell extraction. However, transcription of the body cam video and body cam footage are before this court, which show all interactions with Plaintiff during the events at issue.

Plaintiff misapprehends the distinction between going to medical for assessment or other purposes from obtaining medical treatment. Evidence makes it clear that Plaintiff was to go to medical, where he could and did refuse treatment beyond wound care and assessment. Passage of time is not of significant relevance to the actions taken to obtain Plaintiff's compliance. When detention officers allow time to pass, the likelihood of escalation rises. Once a determination was made that Plaintiff was verbally and physically refusing to comply, it was reasonable to use hands to extract Plaintiff from his cell before escalating further. There is evidence of good faith rationale for Whitlock and Branch's actions and Plaintiff has not presented competent evidence to the contrary. Plaintiff has failed to raise genuine factual dispute in the face of the Defendants' forecast of evidence. The only reasonable conclusion the court can reach is that Defendants' actions were reasonable under the circumstances, there is no culpable state of mind, and the use of force was applied in a good faith effort to maintain or restore discipline and not maliciously or sadistically to cause harm. Plaintiff's assertion that liability extends to Cloninger and Hughes is meritless and without factual support. Plaintiff did not respond to Long's Motion for Summary Judgment.

**(3)** **Defendants Carter and Flitt**

**(A)** **Motion for Summary Judgment** (Doc. No. 97)

Plaintiff alleges that Flitt refused to administer Neurontin pursuant to his prescription but, by the time the issue of Plaintiff's medications came to Flitt's attention, Plaintiff had refused all medical care including Neurontin. No evidence supports Plaintiff's claim.

Plaintiff alleges that Carter subjected him to unwanted medical treatment, however, Plaintiff told the intake nurse that he was diabetic and he had a low-grade fever. Plaintiff was scheduled for follow-up the next day because of these issues. He refused all medical treatment upon arriving at medical but then agreed that Carter could treat his forehead laceration. She took

his blood pressure, temperature, and pricked his finger to see if diabetes and fever affected his ability to make an informed decision about medical care. When the tests were within acceptable limits, Carter immediately noted in the record that Plaintiff was refusing all further medical care and Plaintiff was dismissed. Because of the refusal, Plaintiff received no further medical treatment at Gaston Jail. Carter exercised her professional medical judgment in conducting three simple, minimally invasive tests to determine Plaintiff's capacity to consent or refuse further medical treatment. There was a clear and rational penological interest in determining capacity. The screening examination was a necessary preliminary step in determining Plaintiff's capacity and did not violate Plaintiff's constitutional rights.

Plaintiff's North Carolina claims for assault and battery based on the medical tests done by Carter should be dismissed because the actions were reasonably related to a legitimate penological interest and were within the scope of Carter's professional judgment as a nurse. These actions were done without malice or ill will, but rather, she believed they were medically necessary to provide adequate care.

**(B)** **Plaintiff's Response** (Doc. No. 104)[2]

Plaintiff was told in medical 14 hours before the March 10, 2016 incident with Branch and Whitlock that he would not get Neurontin while he was at the Jail at the direction of Dr. Flitt, and that he would not get ibuprofen for body aches or a low grade fever. Plaintiff told Branch and Whitlock that he was refusing all medical and that he did not want to go to medical. They banged Plaintiff's head into the cell wall, causing a cut that bled profusely then forcibly took him to medical where Plaintiff allowed Nurse Carter to treat the laceration. Plaintiff then informed Carter that he was refusing all further medical treatment until he received the Neurontin. Carter

---

[2] The Court entered an Order pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff of the importance of responding to Defendants' Motion and the applicable legal standard. (Doc. No. 99).

8

nevertheless took his temperature, a finger stick, and a blood pressure test against his will while being held down. Plaintiff remained at the Jail for several more days while he continued to refuse medical treatment. Plaintiff never got his Neurontin at the Jail.

Defendant Flitt attempts to evade responsibility for Plaintiff not being given Neurontin by saying he never addressed the issue. This argument fails in light of the policy of Flitt not allowing the use of Neurontin in the Jail. The medication was prescribed by NCDPS to treat severely painful neuropathy. Flitt's policy of not allowing Neurontin in the Jail caused unnecessary and wanton pain until he returned to NCDPS. Judge Beal had to previously issue a court order that Gaston Jail follow NCDPS medical protocol under penalty of contempt of court.

The argument that an initial examination is needed to determine capacity to refuse treatment fails because this was not Plaintiff's initial examination; it was his third examination over 23 hours, including the health screening on March 9 and further treatment 14 hours later. Plaintiff was told he would not receive his Neurontin and that they usually do not treat low-grade fevers which they already knew Plaintiff had. Plaintiff was not being treated for diabetes or high blood pressure. Carter says she was exercising professional medical judgment but Plaintiff contends that Carter saw that the two officers hurt him and wanted to cover it up. Plaintiff had been at the jail almost 24 hours and there was no question of his competency until he refused medical care.

Plaintiff's North Carolina claims of forced medical care stand as the actions were not related to a legitimate penological interest and were done "out of spite." (Doc. No. 104 at 7). Carter must be held liable for assault, battery and negligence as must Flitt for denying Plaintiff his Neurontin and fostering the atmosphere that pervaded Gaston medical department and Jail and caused Plaintiff a deprivation of rights.

**(4)** <u>**Evidence**</u>[3]

**(A)** <u>**Affidavit of Alan Cloninger**</u> (Doc. No. 88-1)

Defendant Cloninger is the Sheriff of Gaston County and oversees the Gaston County Jail and the individuals housed there. Under the authority granted to him by law, he hires individuals to work in the jail as detention officers, including Officer Branch, Officer Whitlock, Officer Long, and Sergeant Hughes, all of whom received the training required by the State of North Carolina, and are state-certified Detention Officers. Sergeant Hughes is additionally state certified as a Sheriff's Deputy. These individuals' certifications were in good standing, and they were up to date on all training as of the date of the incident addressed in the Amended Complaint.

Sheriff Cloninger has implemented policies and procedures within the Jail to maintain order and discipline. Such policies were in place prior to and on the date of the alleged incident. Among the policies is the Use of Force policy authorizing detention officers and sworn deputies to use the degree of force that reasonably appears necessary under the circumstances, including to maintain order and safety in the Jail and to defend when the use of force is used or imminent against them. "Soft hands to escort or mere physical restraint is not considered a use of force under the policy." (Doc. No. 88-1 at 2). Detention officers and deputies are also authorized to use force with their hands "to include soft hands – touching a prisoner with moderate pressure to turn, guide, escort – and also a higher degree of hands-on such as wrestling, pulling, or bending arms of a suspect when reasonably warranted in circumstances including handcuffing, to obtain compliance with lawful orders, cell extraction or to restore and maintain order." (Doc. No. 88-1 at 2). If prisoners fail to follow a direct order, such as to present to the nurse's station, "it is policy that detention officers are to enforce the order and obtain compliance of the prisoner, including

---

[3] This section is not exhaustive.

extraction from the cell and escort to the nurse's station and if necessary, use a reasonable amount of force to obtain compliance, as deemed necessary by the detention officers confronted with the particular situation." (Doc. No. 88-1 at 2). It is also policy that "detention officers are to assist medical personnel at the nurses' station to maintain or restore order, which includes reasonable efforts to restrain a belligerent or non-compliant prisoner." (Doc. No. 88-1 at 2).

There is no liability insurance that waives governmental or sovereign immunity or covers the North Carolina State claims of assault, battery, or negligence alleged by Plaintiff. (Doc. No. 88-1 at 3).

Dr. Bruce Flitt, DO, is the Medical Doctor who is under contract with the Gaston County Jail to provide necessary medical services to inmates. Dr. Flitt "sets medical policy and oversee[s] medical staff and protocol." (Doc. No. 88-1 at 3). Medical staff are not employees of the Sheriff. Neither the Sheriff nor the Sheriff's employees have access to inmate medical records and only have limited information regarding a patient's health pursuant to HIPAA.

Sheriff Cloninger is not a medical professional and detention officers (including Sergeant Hughes) do not have training on the appropriate medical treatment for inmates and cannot control the plan of patient care set by medical professionals under Dr. Flitt's direction. As Sheriff, Cloninger has an obligation to provide prisoners with adequate medical care. Although a prisoner may refuse medical treatment "assessment and treatment may be necessary despite a refusal of care, when treatment is related to legitimate penological interests" such as to assess "whether the prisoner is making a cognizant refusal of medical treatment in the jail setting to prevent the disorder, the spread of disease and illness." (Doc. No. 88-1 at 3). Sheriff Cloninger relies on competent medical personnel (Dr. Flitt and his staff) to assess and determine if a prisoner is "mentally and physically capable of making a knowing refusal of medical treatment." (Doc. No.

88-1 at 3).

Prior to the incidents alleged, Sheriff Cloninger's staff, including Long, Whitlock, Branch, and Hughes, had been trained in basic procedures including allowing medical personnel to assess, rather than jailers to decide, if a refusal of medical care is appropriate or if medical care or treatment is necessary.

When Plaintiff, a convicted murderer and felon, was brought from prison by DPS on March 9, 2016 for a Gaston County court appearance, he went through jail intake. Then his detained medical screening, treatment, care and concerns were handled by Dr. Flitt and his employees. During jail intake, pursuant to custom, practice and policy, Plaintiff was asked general questions about his medical condition and was referred for medical screening. Pursuant to jail policy, "any medications brought from prison were turned over by DPS to Dr. Flitt. This policy is in place for safety and security within the jail." (Doc. No. 88-1 at 4).

On or about March 10, 2016, "Dr. Flitt and his trained staff made a determination that certain medical care or treatment for Plaintiff was necessary, and following jail procedure, had Plaintiff called on the morning of March 10, 2016 through the in-cell intercom to come to the nurses' station." (Doc. No. 88-1 at 4). When Plaintiff refused to comply, Officers Brank and Whitlock were informed that Plaintiff was not complying with the order and went to Plaintiff's cell to escort him to the nurses' station "pursuant to jail procedure to maintain and restore discipline." (Doc. No. 88-1 at 5). Officer Whitlock was wearing a body camera that recorded the sound and visual of the incident from entry into the cell until Plaintiff concluded the visit to the nurse's station.

The body cam reveals that Plaintiff refused to comply with Officer Whitlock's verbal command to get off his bunk and go to medical, that Plaintiff verbally challenged both jailers to

"take" him, and then when the officer reached to assist Plaintiff off his bunk, Plaintiff pulled his arm away in a defiant manner, then when he was lifted off the bunk, he struggled with officers in an area of roughly four feet between the bunk and cement wall where his eyebrow was grazed and began to bleed, all while Plaintiff was "cussing and threatening the jailers" as he was handcuffed and then escorted to the jail. (Doc. No. 88-1 at 5). The footage reveals that the jailers were calm and professional at all times.

Sheriff Cloninger employed Officer Long who was assigned on March 10, 2016 to the medical area including the nurse's station, and whose duties included providing safety and security in the area and for the medical staff. Should an inmate fail to follow directives, fail to follow procedures, or become disorderly, Officer Long has the "training and authority to use reasonably necessary force to obtain compliance by the inmate, to restore and maintain discipline and the peace and to prevent disturbances." (Doc. No. 88-1 at 5). Officer Long has no specific medical training except CPR certification.

On March 10, 2016 at around 6:30 AM, when Plaintiff came into medical escorted by Officers Branch and Whitlock, Nurse Kim instructed Plaintiff to sit in the chair. Video cameras in the nurses' station and body cam footage and photographs clearly show that Plaintiff was disruptive and non-cooperative with jailers and the nurse. The jailers merely placed their hands on Plaintiff's shoulders for safety and to maintain discipline and security, while the nurse was providing medical treatment and care deemed necessary by the medical staff. No other force was used. Plaintiff initially objected to the nurse's care but then acquiesced. Sergeant Hughes was present and photographed that Plaintiff's wound was medically treated, pursuant to jail procedure. Body cam and video footage show that no excessive force was exerted in the presence of Sergeant Hughes or Officer Long and Plaintiff's medical care was necessary. There is nothing that suggests

to Sheriff Cloninger that intervention to prevent the medical care was appropriate. Jail video and body cam footage showing Plaintiff from the time he leaves his cell until he returns shows that Officers Whitlock and Branch escort Plaintiff without any use of force or display of unprofessional behavior despite Plaintiff's recurrent verbal threats.[4] None of the Defendant jailers have a history or pattern of excessive force against inmates.

As Plaintiff was exiting the nurses' station, Plaintiff made known his refusal for further medical treatment or care. From the time Plaintiff announced his refusal as he left the nurses' station on March 10, 2016, Plaintiff consistently refused medical care and treatment until he left the jail, although he was called to return to the nurses' station for wound care and diabetic check. He did not have any other cuts or exhibit any emergent episodes requiring medical assessment.

Plaintiff was released back to the custody of NCDPS on March 21, 2016, and he was transported back to prison. No grievances or complaints were made while Plaintiff was housed at Gaston County Jail in March 2016.

In order to extract a prisoner from a cell, it is not uncommon that the prisoner, as in this case, be forcibly assisted from his bunk by two and sometimes more detention officers, handcuffed, and then escorted from the cell by detention officers. The cell extraction performed by Officers Whitlock and Branch is an acceptable and reasonable means, under the circumstances presented.

Plaintiff did receive a minor cut about an inch in length during the encounter and the officers' actions to take him right away for medical treatment of the cut was reasonable, appropriate, and consistent with Jail policies, where "cuts and blood require immediate medical attention to [prevent] the spread of disease within the jail." (Doc. No. 88-1 at 8). It is not unusual for a prisoner to have bruises after an encounter with detention officers requiring cell extraction of

---

[4] Defendant Cloninger notes that the surveillance video and body camera time stamps do not accurately reflect the time of day, as they were not accurately synced. (Doc. No. 88-1 at 9).

a non-compliant prisoner.

The incident in the jail cell was reviewed pursuant to policy and "it was determined that the officers did not act inappropriately under the circumstances but that they acted reasonably in response to Plaintiff's refusal to comply with orders and to Plaintiff's actions, and that the amount of force used (i.e. utilizing hands without any deliberate strikes in vital areas) to obtain Plaintiff's compliance was justified as reasonable and necessary under the circumstances, and reveals no indication of malice by any detention officer." (Doc. No. 88-1 at 8). As a trained law enforcement officer, Sheriff Cloninger's assessment of the entire incident depicted in the body cam, video footage, and reports of the officers involved is that "their actions were reasonable and necessary in order to gain control of Plaintiff, to restore and maintain order in the jail, for the safety of the medical staff, and overall jail security." (Doc. No. 88-1 at 8).

The decision of whether medical protocol has been followed in the medical department and whether medical care is necessary lies within the medical discretion of medical staff.

    **(B)**    <u>**Affidavit of Detention Officer Whitlock**</u> (Doc. No. 88-9)

Defendant Whitlock is a certified detention officer at the Gaston County Sheriff's Office. He is trained to speak as calmly as the situation allows yet remain firm and use soft hands to guide a passive non-compliant subject as long as the subject does not become actively combative. He is trained to use hands-on to obtain compliance of a subject or to restore order, which he may determine pursuant to training and circumstances to require more than soft hands, to wrestle, bend arms or pull a subject. He is trained to "use as much force as deemed reasonably necessary to restore or maintain order, obtain compliance, or to defend actual or implied force by the subject." (Doc. No. 88-9 at 1-2).

On March 10, 2016 Defendant Whitlock was in C/D control when there was a call that

Plaintiff had been called to medical and was refusing to go. Whitlock asked Officer Nolen if Plaintiff "had to go to medical" and Nolen replied in the affirmative. (Doc. No. 88-9 at 2). Whitlock and Branch met in the hallway and Whitlock activated his body camera as they approached Plaintiff's cell. After the cell door was opened, Whitlock advised Plaintiff to get out of bed and go to medical. Plaintiff refused. Branch and Whitlock then stepped into the cell and Whitlock approached Plaintiff's bunk. Whitlock ordered Plaintiff to get up and go to medical and Plaintiff began cursing and again refused. When Whitlock reached down to assist Plaintiff off his bunk, Plaintiff began to pull away and attempted to grab Whitlock's right arm. Branch and Whitlock then pulled Plaintiff off his bunk and took him to the wall. Plaintiff kept trying to pull away while the officers were taking him to the wall and Plaintiff sustained a cut over his right eyebrow when he made contact with the wall. Plaintiff also began bleeding from an apparent sore on his right arm. Branch and Whitlock placed Plaintiff's hands behind his back and handcuffed him. Branch and Whitlock then escorted Plaintiff to medical. En route, Plaintiff began to threaten to sue the GCSO as well as Branch and Whitlock. Whitlock called Sergeant Hughes over the radio and asked him to meet them at medical. Plaintiff kept pushing against Branch and Whitlock during the escort to medical.

Upon arriving at medical, Branch and Whitlock had to place Plaintiff in the examination chair because Plaintiff refused to sit down. Nurse Carter began treating Plaintiff's wounds and Plaintiff told her that he was going to sue Gaston County and threatened Officer Branch. Sergeant Hughes arrived and Plaintiff again stated he was going to sue and told Nurse Carter he was going to court and "we'll see what the jury thinks about that." (Doc. No. 88-9 at 4). Sergeant Hughes photographed Plaintiff after Carter treated his injuries. Branch and Whitlock began escorting Plaintiff back to his cell and, as they stepped into the hallway, Plaintiff told Branch and Whitlock

that we "are getting ready to do it all over again." (Id.). Whitlock called Sergeant Hughes and asked him to meet them in the hallway and relayed what Plaintiff had said, which Plaintiff denied. Plaintiff then asked if Whitlock and Branch are afraid of him. Branch and Whitlock escorted Plaintiff into his cell and without further incident.

At the time of the incident, Whitlock had no malice against Plaintiff. Whitlock's actions in using his hands against Plaintiff was because Whitlock "believed it was necessary in order to obtain his compliance with the order to go see the nurse when he refused to go and remained in his bunch, challenging [officers] to force him, then pulling away whenever he could in the cell and verbally refusing to cooperate." (Doc. No. 88-9 at 4). Prior to the incident, Whitlock had been trained to take inmates to the medical nurses' station when requested by medical or jail staff, or when it appeared an emergency medical situation exists. If an inmate refuses treatment, Whitlock has been trained to follow instructions to deliver an inmate to medical to ensure that medical personnel can then make the determination of whether treatment is medically necessary. Whitlock is not a trained medical professional except for CPR. At the time Whitlock went to Plaintiff's cell, Whitlock was unaware of the reason the nurse needed to see Plaintiff. Whitlock is also trained, pursuant to policy, that if an inmate is injured, such as the cut Plaintiff received during the encounter in his cell, that he is to be taken to the medical station for assessment and treatment that the medical personnel deem necessary, which is what Whitlock did.

**(C)** **Affidavit of Corporal Branch** (Doc. No. 88-10)

Defendant Branch was a certified Detention Officer at GCSO at the time of the incident. On March 10, 2016, Branch was sitting in A/B control with Officer Nolen when Officer Long called and said that Plaintiff needed to report to medical for examination. Branch called Plaintiff's cell over the intercom and asked him to get ready to go to medical. Plaintiff refused and Branch

told him he could not refuse. Officer Nolen called C/D control and informed Corporal McCall of the situation. Whitlock asked for Branch to meet him in the A-Block hallway. Whitlock and Branch met in the hall and proceeded to Plaintiff's cell. They again informed Plaintiff that he had to report to medical and could not refuse. Plaintiff again refused and stated they would have to drag him there. Whitlock asked Plaintiff to get up and proceed to medical. Plaintiff again refused and started cursing Branch and Whitlock. The officers entered the cell to assist Plaintiff off his bunk and to medical. Whitlock took Plaintiff by the right arm and started to lift him off his bunk. Plaintiff started to resist by trying to pull away from Whitlock. Plaintiff managed to pull free from Whitlock and Branch grabbed Plaintiff's left arm and pulled him off his bunk. Whitlock regained his grip on Plaintiff's right arm. The officers then lifted Plaintiff to his feet and pushed him to the wall of his cell to gain control of him for handcuffing. As the officers forcefully placed Plaintiff against the cell wall, Plaintiff hit his head on the cell wall, causing a cut above his right eye. The officers pulled Plaintiff's hands behind his back and handcuffed Plaintiff.

Branch and Whitlock escorted Plaintiff to medical. Plaintiff threatened the officers and stated he was going to call the news and sue the GCSO. At medical, Plaintiff refused to sit down so Branch and Whitlock forced him to the chair, then held him in the chair to prevent him from standing up. Whitlock called Sergeant Hughes on the radio and asked him to step into medical to assist with Plaintiff. Nurse Carter treated Plaintiff and checked his vitals. Plaintiff claimed that Carter was cleaning him as part of a cover-up, again threatened to sue, and threatened Branch.

After they were finished in medical, Branch and Whitlock escorted Plaintiff back to his cell. As they approached the elevator Plaintiff said they were going to have to do it all over again once they got to the cell. Whitlock called Sergeant Hughes and informed him of Plaintiff's statement, which Plaintiff denied. Plaintiff was returned to his cell without incident.

At the time of the incident, Branch had no malice against Plaintiff. Nor did Branch know why the nurse needed to see Plaintiff. Branch has been trained in use of force with subjects, including inmates, to use reasonable force necessary to maintain and restore order, obtain compliance to lawful orders, and combat used or threatened force. Branch "felt it was appropriate under the circumstances … that hands-on force was necessary to obtain compliance and control of [Plaintiff] who was resistant in his words and actions." (Doc. No. 88-10 at 3-4).

Branch has been trained that when an inmate has been called by the medical department and refuses to come, that it is a failure of the inmate to comply with a direct order. The inmate's refusal to go to see the nurse who is calling him is different from refusing to receive medical treatment or medications. Branch has been trained that "an inmate cannot refuse to go to the nurse when called, but it is up to the medical personnel to determine if treatment can be declined or refused." (Doc. No. 88-10 at 4). Branch does not make that decision. Branch has no medical training except CPR.

**(D)  Affidavit of Sergeant Hughes**

Defendant Hughes has completed Detention Officer Certification as well as Deputy Certification.

On March 10, 2016, Hughes was called to medical via radio to help Branch and Whitlock with Plaintiff in the medical station of the jail. Hughes took a photo of Plaintiff to show that medical treatment was provided for his cut and stayed in medical until Nurse Carter was finished treating Plaintiff. As soon as Whitlock and Branch left medical, Whitlock called Hughes via radio and asked to meet him at the elevator because Plaintiff had said they would have to do it all over again at his cell.

At the time of the incident, Defendant Hughes had no malice against Plaintiff. It is Hughes'

training that, when medical personnel indicate they need to see an inmate, detention officers provide an escort. If the inmate refuses to comply with the order to present himself when requested for medical or any other reason, it is necessary to assess and if the inmate's response is that he refuses to go, detention officers are authorized to use a reasonable amount of force to obtain compliance from the inmate. Extraction from the cell is required and detention officers are trained to use the amount of force deemed necessary to obtain compliance.

Defendant Hughes spoke to the officers involved, reviewed their statements, and reviewed the body cam footage of the incident. "In this situation, Officers Branch and Whitlock were confronted with a belligerent and resistant inmate, resulting in having to pull [Plaintiff] from his lower bunk and then handcuff him while holding him up against the cell wall." (Doc. No. 88-11 at 2). Plaintiff "struggled when they attempted to gain compliance by handcuffing [and] his head came into contact with the rough cell wall and he received a cut at his eyebrow." (Doc. No. 88-11 at 3). Plaintiff was immediately escorted to the medical area pursuant to policy. The cut appeared to be roughly one inch in length and it was professionally cleaned and treated.

Branch and Whitlock "appeared to have acted professionally and appropriately, and without malice or anger at all times." (Doc. No. 88-11 at 3). The amount of force used I the cell to extract Plaintiff "appeared justified enough to control [Plaintiff's] behavior and was reasonably necessary under the circumstances presented." (Doc. No. 88-11 at 3).

In the medical area, Hughes observed Plaintiff at first refuse to cooperate or have his cut attended by the nurse. He then allowed her to continue to treat the area at his eyebrow. He said he did not want ibuprofen, which was not given. The nurse then checked Plaintiff's temperature and conducted a finger prick. She did not perform any other treatment and did not administer medication. It appeared that she did what was minimally necessary to clean the cut and stop the

bleeding, and then checked his vitals. Plaintiff told Hughes as he was being escorted out of the nurses' area that "from then on he was refusing any other medical treatment." (Doc. No. 88-11 at 3).

**(E)** **Affidavit of Dr. Bruce J. Flitt** (Doc. No. 97-1)

Defendant Flitt, who is licensed to practice medicine in North Carolina, was the Medical Director for the Gaston County Jail in March 2016.

During jail intake on March 9, 2016, Plaintiff informed the intake nurse that he had diabetes. The intake examination records also show that Plaintiff had a low-grade fever at intake.

Defendant Flitt had no direct contact with Plaintiff during the time he was at Gaston County Jail in March 2016. Prior to the incident described in the Complaint, none of the medical personnel who worked under Defendant Flitt's supervision requested that he make a decision regarding what medications should be provided to Plaintiff during the time he was incarcerated at the Gaston County Jail in March 2016. Defendant Flitt "do[es] not have a general policy regarding the use or non-use of prescription medications by Gaston County inmates, but individually evaluate[s] whether medication s should be prescribed on a case-by-case basis, based on [his] medical judgment and a review of the medical records." (Doc. No. 97-1 at 2). Although Defendant Flitt was not consulted by his medical staff regarding Plaintiff's review of Neurontin prior to the incident, Defendant Flitt "do[es] not approve non-life sustaining medications without a careful review of attainable medical records to ensure the appropriateness of the medicine for the diagnosis, and to ensure there are no interactions with other medications or other risks to the patient." (Doc. No. 97-1 at 2). Neurontin is a "widely abused medication in correctional facilities, and only has two FDA approved diagnosis for its use." (Id.). Plaintiff alleges that he was prescribed Neurontin at Central Prison for neuropathy, but "Neurontin is not FDA approved for the treatment

of neuropathy." (Id.). On March 10, 2016 after the incident in medical, Plaintiff refused any and all further medical treatment which would include prescribing Neurontin and other medications. This refusal "also halted the process of obtaining his past medical records to confirm his medical history and diagnoses." (Id.).

In his capacity as Medical Director, Defendant Flitt reviewed the body-cam video and the medical records for the March 9, 2016 intake and March 10, 2016 sick call with Nurse Carter. Nurse Carter "correctly followed appropriate medical protocol in her examination of [Plaintiff] on March 10, 2016, since his medical intake records indicate that he had a fever and was diabetic." (Id.). In light of those conditions, "it was necessary to take his temperature and check his blood pressure and blood sugar to make sure that those conditions were not so severe that they would prevent him from making an informed decision regarding his medical treatment." (Doc. No. 97-1 at 2-3). Once it was determined that his medical condition did not impair his judgment, Nurse Carter "correctly allowed him to refuse any further treatment." (Doc. No. 97-1 at 3). The body-cam video shows that Nurse Carter "conducted herself in a proper, professional manner, and that she only performed those tests that were medically necessary to determine [Plaintiff's] capacity to make decisions regarding his own medical care." (Id.). It also documents Plaintiff's verbal refusal of further medical care and medications. Plaintiff submitted no sick call requests, grievances, or requests for medical care or medications to the Medical Department for the remining 10 days that he was incarcerated at the Gaston County Jail.

**(F)** **Affidavit of Kim Carter** (Doc. No. 97-2)

Defendant Carter is a registered nurse licensed to practice in North Carolina. In March 2016 she was the director of nursing at the Gaston County Jail.

During the intake process for Plaintiff on March 9, 2016, Plaintiff informed the intake nurse

that he had diabetes. The intake examination records also show that he had a low-grade fever. Plaintiff was scheduled for a follow-up medical evaluation on the morning of March 10, 2016 to determine how those problems might be affecting his health. Plaintiff reported to the medical area of the jail escorted by two deputies. He had a cut on his forehead. Plaintiff allowed the bleeding to be controlled and the wound to be covered.

Because Plaintiff reported that he is diabetic and had a low-grade fever at intake, "it was necessary to check his temperature, blood pressure, and blood sugar in order to determine whether any of those conditions might be affecting his mental capacity with respect to his ability to consent to, or refuse any further treatment." (Doc. No. 97-2 at 1). Defendant Carter took Plaintiff's temperature with an oral thermometer, took his blood pressure, and pricked his finger to perform a blood sugar test. Plaintiff told Carter that he was refusing all medical treatment. Once Carter determined that Plaintiff's medical conditions did not impair his judgment, she allowed him to refuse all future medical treatment and made a notation of his refusal in his record. He received no further medical treatment during the remainder of his incarceration in the Gaston County Jail in March 2016.

The three tests that Carter performed "were necessary to determine that [Plaintiff's] condition was not so serious that he lacked the capacity to make an informed decision about his own medical care." (Doc. No. 97-2 at 2). Once Carter determined that those tests were within acceptable limits and documented, Plaintiff received no further medical treatment of any type during his incarceration at the Gaston County Jail.

All of Carter's actions "were in accordance with standard, acceptable medical protocol and practice, and were for the sole purpose of making certain that [Plaintiff] received proper medical care." (Doc. No. 97-2 at 2). Carter "did not act with malice or enmity of any type toward

[Plaintiff]." (Id.).

**(G)** **Body Cam Transcript** (Doc. No. 88-2)

> Whitlock: Mr. Hembree
> Hembree: Yeah
> Whitlock: Get up, you're going to Medical
> Hembree: **Nah**
> Whitlock: Yes sir you are, you're going
> Hembree: **Whelp, take me, I'm not gonna go up outta here man**
> Whitlock: Alright
> …
> Hembree: Oh, y'all can't, mother --, you just lost your job boy, you just don't know
> it yet. Told you, I don't want no goddamn ibuprofen….

(Doc. No. 88-2 at 1) (emphasis added).

> Hembree: … Branch you fucked up boy you just don't know it.
> Branch: OK
> Hebree: … If I get a chance, imma fuck you up.

(Doc. No. 88-2 at 2).

> Hembree: Well since I'm here why did you want to see me?
> Nurse Carter: So I could get your temperature and get your finger stick like what it
> said.
> Hembree: Hmmm, well.
> Nurse Carter: You had a low-grade temp yesterday.
> Hembree: Yep, **well I ain't comin' back in here** ….
> Not cooperating with y'all, I did not resist, these men come in, drug me out of bed,
> slammed my head up against the wall.
> Nurse Carter: Listen.
> Hembree: Somebody's gonna lose their job cause of this. Sayin' I'm upset, say I'm
> violent say whatever you want, gonna lose your job.
> …
> Nurse Carter: Let me wipe off his neck real quick … that's gonna get … is there a
> washcloth in there?
> Long: Yeah.
> Hembree: Lady, I don't need a bath…. Get off me!
> [Many people speaking at once]
> Hembree: You see! You treated my, you treated me, I don't need a bath.
> Nurse Carter: I don't care, I'm going to wipe that off you can't go to the court –
> Hembree (interrupting): I don't give a fuck what you think.
> Nurse Carter: That's fine, I don't care.
> Hembree: Well.
> Nurse Carter: Inspection Control will, so, there ya go.

Hembree: Yeah, yeah, yeah, well you gotta go, you got a point there. Inspection Control, you can get these two pieces of shit up off me. **If I ever get within two feet of you fat boy I'm gonna stick something in you**.

…

Hembree: (Baby Voice) [unintelligible] … a sight for the jury, it ain't gonna hide it, lady, when I go in that courtroom this morning.

Nurse Carter: Why would you take them pads off.

Hembree: *muttering* Cause. People know about – **this ain't the first time I done sued y'all sonsofbitches and won**.

(Doc. No. 88-2 at 5) (emphasis added).

> Hembree: Hey excuse me, Sergeant Hughes –
> Hughes: Yes sir.
> Hembree: **Let medical know I don't want no medication, I'm refusing all medical treatment from out, so don't call me for nothin'. Tell Flitt to kiss my ass**.
> Hughes: Alright we got all that on camera, than you.
> Hembree: **Now boys, you ready to do this again now**.
> Whitlock (into radio): Sergeant Hughes.
> Hughes (on radio): Go ahead.
> Whitlock (into radio): You may want to 25 with us.
> Hembree: I ain't scared of you Whitlock.
> Branch: That's a lie.
> Hembree: Now you fat piece of shit, these … *muttering* … gonna fuck you up man.
> Whitlock (to Hughes): He said we getting' ready to have another one.
> Hughes: Dan
> Hembree: Yeah.
> Hughes: Let's just go down there, get in the cell….
> Hembree: No, I didn't say it, what I said was, next time y'all come take me to Medical, be the same thing. All I did was refuse to go, these fat sonsofbitches rolled in there, jerked me out of bed and slammed my head against the wall.
> Whitlock (overlapping): Let's go.
> Hughes: They gonna, **they're gonna put a refusal up there in Medical,** now just go and, go to your cell, and chill out 'til it's time to go to court.

(Doc. No. 88-2 at 6-7) (emphasis added).

**(H)**    **Plaintiff's Affidavits** (Doc. Nos. 102-1, 104-1)

Plaintiff has filed affidavits under penalty of perjury, (Doc. Nos. 102-1 at 7, 104-1 at 7), in response to Defendants' Motions for Summary. In response to Defendants Branch, Cloninger, Hughes, Long, and Whitlock's Motion for Summary Judgment, Plaintiff states that he "did not

believe that the order to go to medical was a lawful order" because he had refused medical treatment. (Doc. No. 102-1 at 1). Plaintiff denies Defendants' allegation that Plaintiff pulled his arm away in a defiant manner. Branch and Whitlock "grabbed [Plaintiff] with gloved hands … and catapulted [Plaintiff] into the wall face first." (Doc. No. 102-1 at 2). This caused Plaintiff physical and emotional pain and distress and resulted in a laceration above his eye. The camcorder footage shows that Defendants' demeanor was not calm and professional. They were overzealous and had just used excessive force on a "54 year old heart patient suffering from flu like symptoms as well as severe pain brought on by the jail medical staff's refusal to dispense [Plaintiff's] medication for pain." (Doc. No. 102-1 at 2). Defendants only spent 29 seconds in Plaintiff's cell before they injured him. Defendants were "very much aware that [Plaintiff] was being treated for mental illness based on the fact that [Plaintiff] was in their custody no less than 25 times in just a couple of years and [he] would always get [his] mental health meds dispensed while [he] was there." (Doc. No. 102-1 at 3). Plaintiff even had to get a court order because the jail's Medical Director would not dispense Plaintiff's medications as prescribed by his doctors at Central Prison. This happened previously.

Branch and Whitlock assaulted Plaintiff in his cell. Plaintiff was never combative. Plaintiff never made any attempt to assault anyone at the Sheriff's Department. Plaintiff asked for all the video and audio footage so the jury could see Defendants' actions "but instead the defendants produced video and audio that shows what the defendants want you to see." (Doc. No. 102-1 at 3). Video footage from cameras mounted on the walls in the corridor was not turned over to Plaintiff. Branch and Whitlock's use of force was unnecessary and unjustified. "If Branch or Whitlock would have took 29 seconds and explained to [Plaintiff] that [he] needed to go to medical but [he] can refuse medical treatments [Plaintiff] would have went." (Doc. No. 102-1 at 4). Branch,

Whitlock, and someone on the intercom said that Plaintiff cannot refuse medical treatment because he is in jail, which Plaintiff knows is a lie. If Sergeant Hughes had been called sooner, no force would have be used against Plaintiff.

The video shows that there is no unruly disorder or noise on the cell block or in Plaintiff's cell area, so "to say that force was needed to return order and restore discipline are just words that fit in a cliché and have no actual meaning in this case." (Doc. No. 102-1 at 5).

Whitlock states in his affidavit that Plaintiff pushed against the officers on the way to medical when, in fact, the officers had Plaintiff in a full nelson-type hold and they were making it "as uncomfortable as possible" for Plaintiff. (Doc. No. 102-1 at 5).

While in medical at the nurses' station, "[Plaintiff] was very disruptive and uncooperative [because he] had just been assaulted by two deputies." (Id.). Defendant Carter had dealings with Plaintiff's family and legal team and "she wasn't too happy that an accused murderer could get a Superior Court Judge to write an order directing Dr. Flitt and his staff to follow the protocol dictated by the doctors at Central Prison." (Id.). Plaintiff concedes that he "was disruptive" but asserts that he did not deserve what Defendants did to him and that his rights were "blatantly violated" by the people who were supposed to make sure his rights were protected. (Doc. No. 102-1 at 3).

Plaintiff states that Branch and Whitlock's statements that they had no malice against him are not true. "There were a lot of folks working at the jail and in the courthouse who were devastated that the N.C. Supreme Court had protected the rights of an accused murderer and overturned his death sentence." (Doc. No. 102-1 at 6). Branch and Whitlock both had their hands on Plaintiff when Plaintiff was slammed into the wall. This was not an emergency situation and there was no reason for the officers to put their hands on Plaintiff "other than the fact that they

wanted to do what they did" and they had "plenty of time to call a supervisor." (Id.).

Based on Plaintiff's personal experience, Sheriff Cloninger is not qualified to manage a jail and it is "ludicrous" for him to pretend that there is not a problem at his jail, and there are complaints lodge against the Sheriff's Department and jail. (Doc. No. 102-1 at 7).

As a direct result of Defendant's actions and inactions, Plaintiff suffered a laceration above his eye that required medical attention. To this day, Plaintiff suffers from memory loss, PTSD, a sleep disorder and headaches.

In response to Defendants Carter and Flitt's Motion for Summary Judgment, Plaintiff states that he was given a health screening by the intake sergeant on March 9, 2016, and that he was and was told he would see medical within a day or two. Plaintiff was seen in medical approximately nine hours later by a nurse who the Marshal could not serve.[5] That nurse told Plaintiff that "Dr. Flitt had denied the use of [Plaintiff's] prescribed medication Neurontin at the jail because inmates abuse it and [Plaintiff] would not get it as long as [he] was there. This was at the direction of Dr. Flitt." (Doc. No. 104-1 at 2).

Plaintiff asked for some ibuprofen for his body aches and the nurse told him that "they usually don't treat low grade fevers at the jail." (Id.).

Approximately 14 hours later early on the morning of March 10, Branch and Whitlock came to the cell, assaulted Plaintiff, and took him back to medical where he was further assaulted by Branch, Whitlock, and Carter, "forcing unwanted medical care on" him. (Id.).

After Plaintiff "allowed" Defendant Carter to clean up the blood from the cut on his forehead, she tried to take Plaintiff's temperature. Plaintiff told Carter that he was refusing all further medical treatment until Dr. Flitt agreed to prescribe Neurontin as previously prescribed by

---

[5] This apparently refers to Nurse Allie.

NCDPS. Defendant Carter told him to either open his mouth or she would have officers restrain him to take his temperature rectally. At that time, Plaintiff was being held down in the chair. Plaintiff opened his mouth and allowed Carter to take his temperature "against [his] will" in order to "mitigate the situation." (Doc. No. 104-1 at 3). Carter then took a finger prick blood sample and Plaintiff's blood pressure "against [his] will and without [his] consent." (Id.). Plaintiff "was not being treated then nor [has he] ever been treated for high blood pressure or diabetes." (Id.). Defendant Carter, "acting on her own authority violated [Plaintiff's] Constitutional Rights and assaulted [him] by taking his temperature, taking a blood sample and blood pressure against [his] will and having Branch and Whitlock restrain [Plaintiff] in a chair while doing so." (Id.). Nurse Carter saw that the two officers had hurt Plaintiff and wanted to "cover it up." (Id.). If there was any doubt about Plaintiff's ability to make an informed decision about refusing medical care then why was Plaintiff not seen by mental health or his housing status heightened.

Nurse Carter "had arguments with [Plaintiff's] family and caused [him] problems with [his] medical care in the past during [his] trials that went on for approximately five years." (Doc. No. 104-1 at 5). Previously, Judge Beverly Beal had to issue an order that medical staff at Gaston County Jail follow his medical protocol for the duration of trial. NCDPS sent Plaintiff to the jail on a writ along with his Neurontin medication, prescription instructions on the bottle labels, and a dose management sheet. Defendants' assertion that NCDPS transports inmates with their medications but without dispensing instructions is "not only ludicrous, but is a blatant falsehood." (Doc. No. 104-1 at 6).

The defense will say anything for the abusive behavior by staff at the Gaston County Jail, which has continued with impunity for years, not to be exposed.

Nurse Carter stated that she needed to find out if Plaintiff was competent to make an

informed decision about refusing medical care. Although Plaintiff was "enraged at the abuse [he] endured and was quite mouthy and profane, there is nothing to indicate [he] was assaultive in any manner." (Doc. No. 104-1 at 6). Nurse Carter does not get to decide what medical procedures to perform on Plaintiff to satisfy her curiosity.

**(I)**     <u>Letters</u> (Doc. Nos. 103-1)

Defendants have filed a June 5, 2019 letter from defense counsel Martha Thompson to Marshall Pike, the Assistant Superintendent for Custody & Operations at the Harnett Correctional Institution where Plaintiff presently resides. (Doc. No. 103-1 at 1). The letter states that a DVD of video footage from the jail is enclosed with the letter and that there are also instructions for Plaintiff's viewing of the DVD, subject to Plaintiff's request to do so, pursuant to a protective order.

A letter dated the same day is addressed to Plaintiff and informs him that materials have been sent to the Assistant Superintendent for Custody and Operations pursuant to Court Order. (Doc. No. 103-1 at 2).

## II.     LEGAL STANDARDS

**(1)**     <u>Summary Judgment</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted). Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. <u>Id.</u> at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

**(2)    Excessive Force**

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment," <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993). In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 1 (1992).

A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious," <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991); <u>see also</u> <u>Hudson</u>, 503 U.S. at 5, and must result in the denial of "the minimal

civilized measure of life's necessities," <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981). The second requirement is that a prison official must have a "sufficiently culpable state of mind." <u>Wilson</u>, 501 U.S. at 297, 302-03; <u>Hudson</u>, 503 U.S. at 5, 8. "[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." <u>Hudson</u>, 503 U.S. 1, 4 (1992); <u>see</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 34 (2010). The "core judicial inquiry," is not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 7. "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated ... whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." <u>Hudson</u>, 503 U.S. at 9, 13–14.

**(3)     Deliberate Indifference to a Serious Medical Need**

"[T]he Eighth Amendment's prohibition against 'cruel and unusual punishments' [extends] to the treatment of prisoners by prison officials" and "forbids the unnecessary and wanton infliction of pain," <u>Hill v. Crum</u>, 727 F.3d 312, 317 (4th Cir. 2013) (internal quotations omitted).

Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994). <u>See</u> <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016). The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry. <u>See</u> <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008). In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a

substantial risk of such serious harm resulting from ... exposure to the challenged conditions." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled on other grounds by Farmer, 511 U.S. at 825. Negligence or malpractice does not violate the Eighth Amendment. Miltier, 896 F.2d at 852. Further, "mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." Scinto, 841 F.3d at 225 (quoting Wright v. Collins, 766 F.2d 841, 840 (4th Cir. 1985)).

**(4)     Unwanted Medical Treatment**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. The applicability of the Fourth Amendment turns on whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." Hudson v. Palmer, 468 U.S. 517, 525 (1984) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)). A prisoner maintains some legitimate expectation of privacy in his person. King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016). A court is to consider the following factors to determine the reasonableness of a search: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559 (1979).

Further, "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 278 (1990). This

liberty interest survives conviction and incarceration. <u>Washington v. Harper</u>, 494 U.S. 210, 221–22 (1990) (recognizing an individual's "significant liberty interest in avoiding the unwanted administration" of a specific form of medical treatment); <u>Hogan v. Carter</u>, 85 F.3d 1113, 1116 (4th Cir. 1996) (*en banc*) (citing <u>Harper</u>, 494 U.S. 221–22). In this context, prison officials may override this right when treatment is "reasonably related to legitimate penological interests." <u>Harper</u>, 494 U.S. at 223 (citing <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)). The fit between the jail's legitimate interests and its policy need not be perfect in order to survive scrutiny, it need only be rational. <u>Waterman v. Farmer</u>, 183 F.3d 208, 215 (3d Cir. 1999); <u>see also Turner</u>, 482 U.S. at 89-90 ("a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."). "This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review." <u>Harper</u>, 494 U.S. at 223 (citation omitted).

**(5)    Supervisory Liability**

A supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

**(6)    Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818

(1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico Cnty., Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555

U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

**(7)** **North Carolina Law**

**(A)** **Governmental Immunity**

Governmental immunity "is that portion of the State's sovereign immunity which extends to local governments." Wray v. City of Greensboro, 370 N.C. 41, 47, 802 S.E.2d 894, 898 (N.C. 2017). Generally, sovereign or governmental immunity "bars claims brought against the state or its counties, where the entity sued is being sued for the performance of a governmental, rather than a proprietary, function." Doe v. Jenkins, 144 N.C.App. 131, 134, 547 S.E.2d 124, 126 (2001) (internal citation omitted). Sovereign immunity may be waived by the purchase of liability insurance. See N.C. Gen. Stat. § 153A-435. However, a government entity does not waive sovereign immunity if the action brought against them is excluded from coverage under their insurance policy. See Patrick v. Wake Cnty. Dep't of Human Servs., 188 N.C.App. 592, 655

S.E.2d 920 (2008). Further, "[w]aiver of sovereign immunity may not be lightly inferred and State statutes waiving this immunity, being in derogation of the sovereign right to immunity, must be strictly construed." Guthrie v. N.C. State Ports Auth., 307 N.C. 522, 537-38, 299 S.E.2d 618, 627 (1983).

**(B)    Public Official Immunity**

Public official immunity is a "derivative form" of governmental immunity. Wilcox v. City of Asheville, 222 N.C. App. 285, 288, 730 S.E.2d 226, 230 (2012) (quoting Epps v. Duke Univ., 122 N.C.App. 198, 203, 468 S.E.2d 846, 850 (1996)). Suit against public officials in their individual capacities is precluded "unless the challenged action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." Id.  A defendant acts with malice when an act is done wantonly, contrary to the actor's duty, and is intended to be injurious to another. Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). Accordingly, "public officers' immunity, at the least, is unavailable to officers who violate clearly established rights because an officer acts with malice when he 'does that which a man of reasonable intelligence would have known to be contrary to his duty.'" Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003) (quoting Grad, 312 N.C. at 321 S.E.2d at 890); Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) (explaining that state law "man of reasonable intelligence standard" is "functionally identical" to federal "clearly established" standard).

**III.    DISCUSSION**

**(1)    Unserved Defendant**

The Amended Complaint passed initial review on a claim against Nurse Allie for deliberate indifference to a serious medical need by failing to provide him with prescribed medication or provide alternative medication. However, the U.S. Marshal was unable to serve Defendant Allie

after several attempts and the time for service has expired. Rule 4(m) of the Federal Rules of Civil Procedure allows the court to dismiss *sua sponte* unserved defendants after 90 days following the filing of the complaint. Fed. R. Civ. P. 4(m). While the rule requires the court to extend the period for service upon a showing of good cause, Plaintiff has failed to do so and none appears on the record. Accordingly, the Court will exercise its discretion to dismiss the remaining unserved defendant without prejudice under Rule 4(m).

**(2)**     <u>**Excessive Force**</u>

Plaintiff claims that Defendants Branch and Whitlock snatched him from his bunk and maliciously slammed him face-first into a wall while they were attempting to escort him to medical.

Defendants have submitted evidence, that Plaintiff does not refute, that Plaintiff was called on the intercom to go to medical and refused. The video evidence and transcript show that Defendants Branch and Whitlock went to Plaintiff's cell and told him in person that he was going to medical. Plaintiff refused and continued to lie on his bunk. The officers maintain that they had no animus towards Plaintiff, that Plaintiff was resistant and non-compliant, that they used minimal hands-on force to gain control over him and escort him to medical, and that Plaintiff's resistance caused his head to bump the wall. Plaintiff claims that Branch and Whitlock had animus against him because he had his murder case overturned, that they unnecessarily resorted to physical force, and that they purposely slammed him into the wall.

A dispute remains regarding whether Plaintiff's head striking the cell wall was due to officer malice, or due to Plaintiff's physical resistance in attempting to jerk away from officers. Plaintiff claims that officers acted maliciously because they were angry his death sentence was overturned, and officers claim that Plaintiff's collision with the wall was due to his physical

resistance. No objective evidence illustrates which of these alternatives occurred and the evidence must be viewed in favor of the non-moving party, Plaintiff. This genuine dispute of material fact precludes summary judgment. This material factual dispute also makes it impossible for the Court to determine that qualified immunity applies Therefore, Defendants' Motion will be denied and this case will proceed to trial on Plaintiff's excessive force claim.

(3)    **Deliberate Indifference to a Serious Medical Need**

Plaintiff claims that he was refused Tylenol or ibuprofen by the intake nurse, that Defendants Flitt and the intake nurse failed to follow prescribed medical protocol and refusing to administer his Neurontin or provide alternative medication for a painful diagnosed medical condition.

Defendant Flitt has filed an affidavit stating that he had no direct contact with Plaintiff during the time he was at Gaston County Jail in March 2016. Prior to the March 10, 2016 incident, none of the medical personnel who worked under Defendant Flitt's supervision requested that he make a decision regarding what medications should be provided to Plaintiff during the time he was incarcerated at the Gaston County Jail in March 2016. Nor does Defendant Flitt have a general policy regarding the use or non-use of prescription medications by Gaston County inmates, but individually evaluates whether medications should be prescribed on a case-by-case basis. Further, Neurontin is widely abused in correctional facilities and only has two FDA approved diagnoses for its use, of which neuropathy is not one. Plaintiff's March 10, 2016 refusal of any and all further medical treatment which would include prescribing Neurontin and other medications and halted the Jail's request for his prior medical records.

In response to Defendant Flitt's Motion for Summary Judgment, Plaintiff states that an un-served nurse told Plaintiff that Flitt had denied the use of Neurontin at the Jail because inmates

abuse it and that Flitt directed that Plaintiff not receive it while at the Jail. Plaintiff also appears to suggest that his refusal of medical treatment on March 10, 2016 was conditioned on Flitt's provision of Neurontin.

The transcript from the March 10 incident shows that Plaintiff refused ibuprofen almost as soon as the officers came into his cell. (Doc. No. 88-2 at 1). Defendant Flitt states in his affidavit that Neurontin is widely abused in correctional facilities and that neuropathy is not one of that medication's two FDA-approved uses. The March 10 transcript also shows that Plaintiff refused all further medical treatment following his visit to the nurse's station and that the refusal was not conditioned on Defendant Flitt's provision of Neurontin. Defendant Flitt states in his affidavit that Plaintiff did not make any further requests for medical care for the following 10 days that Plaintiff remained at the Jail.

The record conclusively demonstrates that Plaintiff refused ibuprofen and unconditionally waived any further medical treatment such that no reasonable jury could believe Plaintiff's version of events. Plaintiff has not come forward with any evidence refuting Defendant Flitt's assertions about Neurontin's abuses, its FDA-approved uses, or Plaintiff's failure to request any further medical treatment after his March 10 refusal. Under these circumstances, Plaintiff has failed to show that a genuine dispute of material fact exists with regards to Defendant Flitt's alleged deliberate indifference to a serious medical need. Nor has Plaintiff demonstrated that a genuine dispute of material fact exists with regards to Defendant Flitt's alleged supervisory liability.

Defendant Flitt will therefore be granted summary judgment on Plaintiff's claim of deliberate indifference to a serious medical need.

**(4)**     **<u>Unwanted Medical Care</u>**

Plaintiff alleges that, despite Plaintiff's refusal of medical care, Nurse Carter tested his

blood sugar with a finger stick and measured his temperature and blood pressure while Defendants Branch and Whitlock held him in a chair in the presence of Defendants Hughes and Long.

Plaintiff admits in his Amended Complaint that he "advised [the intake officer] that he had … diabetes … [and] complained of shortness of breath and body aches and pains," and that he had a "low grade fever" at intake. (Doc. No. 62 at 3). Defendants Flitt and Carter have submitted affidavits stating that the three tests performed by Carter were in accordance with standard, acceptable medical protocol and practice and were necessary to determine whether Plaintiff had the capacity to accept or refuse medical care in light of his conditions. (Doc. No. 97-1 at 2-3); (Doc. No. 97-2 at 1-2). Defendant Carter denies that she acted with malice or enmity of any type toward Plaintiff (Doc. No. 97-2 at 2). Defendants Flitt and Carter both state in their affidavits that, once it was determined that those tests were within acceptable limits and documented, Plaintiff received no further medical treatment of any type during his incarceration at the Gaston County Jail. (Id.).

The parties agree that the scope of the disputed medical intrusion was an oral temperature check, finger stick blood sugar test and blood pressure cuff. The record conclusively establishes that, after the three tests came back within acceptable limits, Plaintiff's refusal was noted in the medical records and he was not subjected to any further medical intervention except the cleaning of his head wound to which he consented. Although Plaintiff contends that Defendant Carter was motivated by malice because Plaintiff had given her problems before, he does not refute Flitt's and Carter's affidavit statements that the three tests were necessary to determine whether he had the capacity to consent to or refuse medical treatment. Plaintiff has failed to demonstrate a genuine dispute of material fact that there was a rational basis for the imposition of three unwanted and minimally intrusive medical tests under these circumstances, or that the correctional officers who

were present failed to intervene in conduct that subjected Plaintiff to an excessive risk to his health or safety or otherwise violated his constitutional rights.

Therefore, summary judgment will be granted in favor of Defendants on Plaintiff's claim that he was subjected to unwanted medical treatment.

**(5)      Supervisory Claims**

Plaintiff alleges that Sheriff Cloninger failed to have policies in place to prevent assault and battery, failed to enforce policies or have basic training for staff regarding the right to refuse medical treatment, and failed to have in place and/or enforce policy to ensure that a trained supervisor be present to prevent assault and battery by overzealous staff when a prisoner refuses to leave his cell for any reason.

Defendants have provided evidence that Defendant Cloninger does not set medical policy or oversee medical staff and protocol, and that medical staff are not employees of the Sheriff. Plaintiff has failed to come forward with any evidence to refute Defendants' evidence. He has failed to demonstrate the existence of a genuine dispute of material fact with regards to the foregoing. Further, Plaintiff has failed to demonstrate that the medical Defendants violated his constitutional rights. Therefore, this supervisory claims against Sheriff Cloninger upon which his medical § 1983 claims were based, also fails. See Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999) (claims against sheriff that the policies, customs, and training at a detention center were inadequate and that these shortcomings caused the sheriff's employees to be deliberately indifferent to plaintiff's serious medical needs and to use excessive force against him "fails for a variety of reasons, most notably because [the sheriff's] officers have not violated any of [plaintiff's] constitutional rights.").

Defendant Cloninger has also presented evidence that he has implemented policies and

procedures within the Jail to maintain order and discipline including a Use of Force policy that authorizes force to maintain order and safety in the Jail and to defend when the use of force is used or imminent against them, and to assist medical personnel at the nurses' station to maintain or restore order. Defendants have presented evidence that Sheriff Cloninger hires individuals to work in the jail as detention officers who receive the training required by the State of North Carolina, that Officers Branch, Whitlock, Long, and Sergeant Hughes' certifications were in good standing and they were up-to-date on all training as of the date of the incident addressed in the Amended Complaint. Plaintiff fails to dispute this evidence and has not demonstrated the existence of a genuine dispute of material fact that Defendant Cloninger knew his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury, that he was deliberately indifferent to or tacitly authorized offensive practices, or that any deficiency in policy, procedure, or training actually caused a constitutional violation of any kind. see, e.g., Grayson, 195 F.3d at 697 (granting sheriff summary judgment on claims by the estate of a deceased detainee of inadequate training of detention center employees where there was evidence that the detention center had been accredited for more than 10 years by two organizations whose training requirements exceed minimal constitutional standards and the detainee's estate failed to explain how any deficiency in training actually caused a constitutional violation) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989) (applying the deliberate indifference analysis to a failure-to-train § 1983 claim)).

Accordingly, Defendant Cloninger will be granted summary judgment on the claims against him as a supervisor.

**(6)** **Qualified Immunity**

Summary judgment is being granted in favor of the medical Defendants because no

constitutional violations occurred, and in favor of Defendant Cloninger as a supervisor. Therefore, those Defendants are entitled to qualified immunity on those claims as well. However, because genuine disputes of material fact preclude summary judgment on Plaintiff's excessive force claims, the Court cannot determine at this juncture whether Defendants are entitled to qualified immunity on those claims and summary judgment will be denied.

**(7)** **North Carolina Claims**

Plaintiff asserts state law claims of assault and battery,[6] and negligence.[7] Defendant Carter argues that the assault and battery claims based on the medical testing she performed on Plaintiff should be dismissed because her actions were reasonably related to legitimate penological interests, were within the scope of her professional judgment, were done because she believed them to be medically necessary, and were done without any malice or ill-will towards Plaintiff. Defendants Branch, Whitlock, Hughes, Long, and Cloninger argue that they are immune from Plaintiff's state-law claims pursuant to governmental immunity because they were performing under their governmental functions and to public official immunity because the record does not reveal any action that was malicious, corrupt, or outside the scope of official duties.

Defendants will be granted summary judgment on the state-law claims against them in their official capacities because there is no genuine dispute of material fact that Defendants were

---

[6] North Carolina follows common-law principles governing assault and battery. An assault is an offer to show violence to another without striking him, and battery is the carrying of the threat into effect by the infliction of a blow. Dickens v. Puryear, 302 N.C. 437, 445, 276 S.E.2d 325, 330 (1981). While a civil action for assault is available under North Carolina law, the use of force under the circumstances must be excessive for the claimant to prevail. Myrick v. Cooley, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988). Whether force was excessive is judged by a standard of objective reasonableness. Jordan v. Civil Svc. Bd., 153 N.C.App. 691, 698, 570 S.E.2d 912, 918 (2002).

[7] North Carolina law requires that "in order to prevail in a negligence action, [a plaintiff] must offer evidence of the essential elements of negligence: duty, breach of duty, proximate cause, and damages." Blackwell v. Hatley, 202 N.C.App. 208, 212, 688 S.E.2d 742, 746 (2010); Camalier v. Jeffries, 340 N.C. 699, 460 S.E.2d 133, 136 (1995). "Actionable negligence is the failure to exercise the degree of care which a reasonable and prudent person would exercise under similar conditions. A defendant is liable for his negligence if the negligence is the proximate cause of injury to a person to whom the defendant is under a duty to use reasonable care." Hart v. Ivey, 332 N.C. 299, 420 S.E.2d 174 (1992) (internal citations omitted).

discharging governmental functions and that their immunity was not waived by liability insurance. <u>See</u> (Doc. No. 88-1 at 3) (evidence that there is no liability insurance that waives governmental or sovereign immunity or covers the North Carolina State claims of assault, battery, or negligence alleged by Plaintiff.).

With regards to Plaintiff's individual capacity claims, the Court has determined that Defendants should be granted summary judgment on Plaintiff's federal medical claims because no constitutional violation occurred. The same is true of the supervisory claims against Defendant Cloninger. No genuine dispute of material fact exists with regards to the existence of a legitimate penological interest, lack of malice, or actions outside of the scope of medical duties with regards to these claims. Therefore, Defendants' Motion for Summary Judgment will be granted on Plaintiff's state-law claims related to medical care and against Defendant Cloninger as a supervisor. <u>See</u> <u>generally</u> <u>Maney v. Garrison</u>, 681 Fed. Appx. 210 (4th Cir. 2017) (affirming summary judgment in favor of defendant on a state-law battery claim because, "having determined that [the defendant police officer] transgressed no clearly established constitutional boundaries, that theory of maliciousness fails.").

However, the Court has denied summary judgment on Plaintiff's federal claims regarding the use of excessive force because a genuine dispute of material fact exists regarding whether Defendants Branch and Whitlock's actions were malicious. The Court is unable to determine at this juncture whether public officer immunity applies, and therefore, Defendants Branch and Whitlock's Motion for Summary Judgment of the state law claims related to their alleged use of excessive force will be denied.

## IV.    PENDING MOTION

Plaintiff has filed a Motion seeking an extension of time to file a response to Defendants

Carter and Flitt's Motion for Summary Judgment. (Doc. No. 101). Plaintiff's Motion will be granted insofar as his Response has been accepted as timely filed.

## V. CONCLUSION

Based on the foregoing, Defendants' Motions for Summary Judgment are granted in part and denied in part and Plaintiff's Motion for an Extension of Time is granted.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants Branch, Cloninger, Hughes, Long, and Whitlock's Motion for Summary Judgment, (Doc. No. 88), is **GRANTED** in part and **DENIED** in part. The case will proceed to trial on Plaintiff's excessive force claims against Defendants Branch and Whitlock as well as the related state law claims.

2. Defendants Carter and Flitt's Motion for Summary Judgment, (Doc. No. 97), is **GRANTED**.

3. Plaintiff's Motion for an Extension of Time, (Doc. No. 101), is **GRANTED** as stated in this Order.

4. The Court *sua sponte* **DISMISSES** this action as to Defendant Allie without prejudice.

5. The Clerk is respectfully instructed to use reasonable efforts to locate a volunteer lawyer to assist Plaintiff at trial pursuant to 3:19-mc-13.

Signed: March 3, 2020

Frank D. Whitney
Chief United States District Judge